Linda Sue RUSH, Appellant,

v.

ALASKA MORTGAGE GROUP, Gerry
DePriest and Maryanne DePriest,
Appellee.

No. S–7348.

Supreme Court of Alaska.

April 25, 1997.

John R. Snodgrass, Jr., Palmer, for Appellant.

Tonja Woelber, Anchorage, for Appellee.

Before COMPTON, C.J., and RABINOWITZ and EASTAUGH, JJ.

OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

Linda Sue Rush entered into a real estate transaction that inadvertently extinguished her senior security interest in the land. As a result, Alaska Mortgage Group, which held the second deed of trust, became the senior lienholder. We must decide whether equitable subrogation restores the priority of Rush's security interest. The superior court ruled against her and granted summary judgment to Alaska Mortgage Group, Gerry DePriest, and Maryanne DePriest. We reverse and remand.

## II. FACTS AND PROCEEDINGS

In April 1976 Edward Cyrus Rush sold approximately 8.9 acres of land in the Matanuska–Susitna Borough to Thomas Norris and Linda Norris. The Norrises executed a promissory note (Norris Note) in favor of Rush for $23,000, the balance of the purchase price. The Norris Note was payable at $150 per month with interest of nine percent per year. The Norrises executed a deed of trust (1976 Deed of Trust) on the property to secure their note.[1]

The Norrises sold the property to the Cunninghams in 1978. In partial payment, the Cunninghams executed a deed of trust (1978 Deed of Trust) and note in favor of the Norrises. In 1979 Alaska Mortgage Group (Mortgage Group) purchased the 1978 Deed of Trust and note from the Norrises.

There were three sales of the property between 1980 and 1988.[2] In each instance the new owner assumed the obligations of the prior owners.

Edward Cyrus Rush died in February 1988. Linda Sue Rush, his surviving spouse, was the personal representative of his estate.

Fred Clingman purchased the property in early 1988. Clingman's payments to Linda Sue Rush were irregular. As a result, Rush hired attorney John Shaw for "help on the

---

1. There were no encumbrances on the property prior to the 1976 Deed of Trust.

2. The Carlsons bought the property from the Cunninghams in 1980. The Thompsons bought the property from the Carlsons in 1983. Fred Clingman bought the property in 1988.

payments." Rush did not then know that other deeds of trust, including the 1978 Deed of Trust owned by Mortgage Group, encumbered the property. Her attorney did not order a title report on the property.

In June 1988 Linda Sue Rush deeded the property to Clingman by warranty deed, despite the fact she had no ownership interest in it. Even though five deeds of trust encumbering the property had been executed after the Norrises signed the 1976 Deed of Trust, Linda Sue Rush's 1988 warranty deed contained no exceptions for the six previous deeds of trust, including the Norris deed of trust.

In exchange for the warranty deed, Rush received from Clingman a deed of trust (1988 Deed of Trust) and note (Clingman Note). The annual interest rate on the Clingman Note, nine percent, was the same as the rate on the Norris Note; the amount of the Clingman Note, $21,600, was less than the amount of the Norris Note, $23,000. The Clingman Note was payable at $250 per month. The Norris Note was payable at $150 per month. The 1988 Deed of Trust was seventh in priority. Clingman signed the new note and deed of trust on June 17, 1988. Rush's warranty deed and Clingman's deed of trust were recorded on June 27, 1988.

On August 3, 1988, David McCabe, general partner of Mortgage Group, telephoned Rush to inquire about the 1976 Deed of Trust. On August 10 Rush gave McCabe written authorization to review the National Bank of Alaska escrow account holding the Norris Note and the 1976 Deed of Trust.

On October 7, 1988, Rush's attorney, Shaw, received a packet of documents from the escrow account, including the original Norris Note, the trustee's deed of reconveyance, and the original request for full reconveyance signed by Edward Cyrus Rush.

Sometime after October 7, Shaw's secretary, Judy Scorup, wrote "Paid June 17, 1988," on the Norris Note. She later sent the Norris Note and the request for reconveyance to the title company, which recorded them on November 1, 1989. The recording of the deed of reconveyance extinguished the 1976 Deed of Trust. At this time, Shaw was very ill with terminal cancer; he died in May 1991.

Clingman made payments on at least three promissory notes and the accompanying deeds of trust until 1991. In 1991 Clingman's payments stopped, and Mortgage Group commenced a foreclosure action. Clingman owed Mortgage Group $21,388.17 as of May 1991, and he owed Rush $16,995.68 as of September 1991.

Rush received notification of the foreclosure sale. Through attorney John Snodgrass Rush requested in December 1991 that Mortgage Group treat her as the senior creditor. In 1992 Rush brought an action against all trustors, trustees, and beneficiaries of the property, to reinstate the first priority of the 1976 Deed of Trust. In April 1992 the trustee at foreclosure sold the property by quitclaim deed to Mortgage Group, subject to notice of the Rush action. Mortgage Group then sold the property to Gerry DePriest and Maryanne DePriest.

Rush asked the court to reform the 1976 Deed of Trust and Norris Note so that the balance owing would be identical to that of the 1988 Deed of Trust and Clingman Note. Rush later dismissed all defendants except Mortgage Group, the Norrises, and the DePriests.

Rush moved for partial summary judgment. Mortgage Group opposed and cross-moved for summary judgment. The superior court granted partial summary judgment to the Norrises and dismissed them from the action.

The superior court denied Rush's summary judgment motion and granted Mortgage Group's cross-motion. The court concluded that the doctrines of mistake, unjust enrichment, and equitable subrogation did not afford Rush relief under the circumstances.

Rush appeals.

### III. *STANDARD OF REVIEW*

We review the superior court's grant of summary judgment *de novo*. *Nielson v. Benton*, 903 P.2d 1049, 1052 (Alaska 1995). We will consider any matter in the record that indicates the existence of a genuine issue of material fact. *American Restau-*

*rant Group v. Clark,* 889 P.2d 595, 597–98 (Alaska 1995). Finally, the non-moving party is entitled to have the record reviewed in the light most favorable to it and to have all reasonable inferences drawn in its favor. *Metcalfe Investments, Inc. v. Garrison,* 919 P.2d 1356, 1360 (Alaska 1996) (citation omitted).

## IV. *DISCUSSION*

We must decide whether the doctrine of equitable subrogation can provide relief to a creditor who has released her senior security interest. The superior court held that the doctrine did not allow relief and granted summary judgment against Rush. We conclude that the superior court erred in treating actual notice as dispositive of the equitable subrogation doctrine, and hold that Rush is able to make out a claim under this doctrine.

### A. *Equitable Subrogation*

■ The doctrine of equitable subrogation prevents unjust enrichment as a result of the inadvertent release of a security interest in land. *See generally* 1 George E. Palmer, *The Law of Restitution* § 3.6 (1978). In the absence of agreements or statutes, the rule of priority is "prior in tempore, potior in jure" (first in time, superior in right). *See* AS 34.35.060(a); *Nystrom v. Buckhorn Homes, Inc.,* 778 P.2d 1115, 1121 (Alaska 1989). A deed of trust that is renewed or modified creates a problem for the senior creditor if security interests attach to the property in the period between the initial execution and the renewal. If the senior creditor releases her deed of trust in exchange for a new deed of trust without a new agreement regarding priority, the junior creditor then may receive first priority. Assuming there has been no detrimental reliance on the release, the junior creditor would be unjustly enriched by the senior creditor's mistake. Under certain equitable circumstances, the senior creditor may be subrogated to and may assert the original priority of the former encumbrance.

■ Under this doctrine, the senior creditor is not subordinated to subsequent encumbrances absent either an intent to subordinate, or "paramount equities" in favor of junior creditors that justify subordinating the senior interest. *See, e.g., Commercial Fed. Sav. & Loan v. Grabenstein,* 231 Neb. 647, 437 N.W.2d 775, 777–78 (1989); *Houston Lumber Co. v. Skaggs,* 94 N.M. 546, 613 P.2d 416, 417 (1980); *Resolution Trust Corp. v. Barnhart,* 116 N.M. 384, 862 P.2d 1243, 1250 ("[W]e are persuaded that the better view is that constructive notice and negligent ignorance of the intervening lien are immaterial to whether the equitable reinstatement of a prior lien should be allowed."), *cert. denied,* 116 N.M. 364, 862 P.2d 1223 (1993).

Some courts have held the mortgagee "not to be entitled to protection, particularly where the earlier mortgage is discharged with knowledge of the existence of the intervening lien." 55 Am.Jur.2d *Mortgages* § 402, at 119 (1996) (citing cases). The superior court's decision followed the proposition that equitable subrogation will be denied to a renewing senior lender who releases her deed of trust with actual knowledge of the junior encumbrance. We think that overstates the significance of actual knowledge. Most cases and commentators find that actual knowledge is not dispositive of equitable subrogation and at most would be evidence of the creditor's intent to subordinate. *See, e.g., Grabenstein,* 437 N.W.2d at 777 (stating that "[o]rdinarily, it is presumed that one must have intended to keep alive his mortgage title, where it was essential to his security against an intervening title"); *Auto Acceptance & Loan Corp. v. Taus,* 28 Wis.2d 496, 137 N.W.2d 452, 454–55 (1965). *Cf.* Robert Kratovil & Raymond J. Werner, *Mortgage Extensions and Modifications,* 8 Creighton L.Rev. 595, 602–03 (1975) ("It is unfortunate that some courts have stressed the point that the mortgagee was unaware of the existence of intervening liens when he released his mortgage and accepted a substitute.... The more realistic approach is that priority is simply not lost by substitution unless that is the intent of the parties.").

The superior court denied equitable subrogation relief, because it held that Rush had actual notice of other encumbrances on August 3, 1988, before the transaction was com-

plete, and therefore could have prevented release of the 1976 Deed of Trust.

As explained above, however, the two main considerations in deciding whether an equitable subrogation claim restores the original priority are (1) whether there was an intent to subordinate the new deed of trust and (2) whether paramount equities favor the junior creditor.

### 1. *Intention to subordinate*

Rush maintains that the refinancing of the Norris Note was completed before she became aware of Mortgage Group's interest in the property. Rush claims that the transaction was completed June 27, 1988, when the Clingman Note and 1988 Deed of Trust were recorded, thus requiring the inevitable reconveyance of the 1976 Deed of Trust. As of June 27, 1988, Rush was committed to releasing the 1976 Deed of Trust even though it was not in fact released until 1989. Therefore, Rush implies that she had no intent to subordinate the 1988 Deed of trust.

The record provides little evidence to support a conclusion that Rush harbored any intent to subordinate. She accepted the Clingman Note in June 1988, before she had actual knowledge of Mortgage Group's interest, and she affied that she was not aware of any other deeds of trust on the property. She received higher monthly payments from Clingman (a circumstance found important by the superior court), but the interest rate on the Clingman Note was the same as for the Norris Note and the principal did not increase. Therefore, the Clingman Note seems to merely modify the payments on the original debt.

The superior court inferred that Rush intended to subordinate the 1988 Deed of Trust based on her receipt of actual knowledge before the 1976 Deed of Trust was reconveyed and given the larger payments on the Clingman Note:

Equity is not moved to relieve plaintiff of the consequences of her actions taken with actual knowledge, as plaintiff's position is effectively indistinguishable from that of any other person who makes the business decision to favor higher monthly payments over lower monthly payments with a higher security interest.

■■■ The superior court drew this inference in granting summary judgment against Rush, the non-moving party. All reasonable inferences of fact from proffered materials must be drawn against the moving party and in favor of the non-moving party. *Wright v. State*, 824 P.2d 718, 720 (Alaska 1992). In addition, "[s]ummary judgment is generally inappropriate where a party's state of mind is at issue." *Wilcox Assocs. v. Fairbanks N. Star Borough*, 603 P.2d 903, 906 (Alaska 1979).

■■■ Although Rush did not expressly state in her affidavit that she had no intention of subordinating her new security position, she affied she did not know or understand that anyone else had a deed of trust on the property. She also affied:

Mr. Shaw said he would handle the matter, and he did not tell me that I could lose my money by working with Mr. Clingman. Mr. Shaw did not explain about other deeds of trust or anything like that and I have never understood these matters. I left the whole matter to him.

These assertions reasonably support the inference that she did not intend to subordinate her priority of interest. If she did not know of subsequent deeds of trust, she could not have intended to subordinate her senior security position to holders of subsequently-executed deeds of trust. In considering the motion seeking summary judgment against her, it cannot be affirmatively inferred that she intended to subordinate her senior interest. Absent evidence establishing Rush's intent beyond genuine dispute, it was error to grant summary judgment against Rush on this issue.

### 2. *Paramount equities*

■■■ The other factor to be considered under the doctrine of equitable subrogation is whether junior creditors are favored by paramount equities that justify subordinating the senior creditor's security interest. *See Barnhart*, 862 P.2d at 1248–49. *See generally* 1 Grant S. Nelson & Dale A. Whitman, *Real Estate Finance Law* § 9.4, at 815 (3d

ed.1993). This consideration often turns on whether the junior creditors detrimentally relied on the apparent discharge of the senior encumbrance. *Id.*

Rush claims that Mortgage Group has not asserted any paramount equities in its favor because it did not rely on the reconveyance of the 1976 Deed of Trust and because reinstatement would not worsen its position.

■ The record before us gives no indication that Mortgage Group detrimentally relied on the release of the 1976 Deed of Trust. Mortgage Group did foreclose on its deed of trust, but only after it was given notice of Rush's claims. There is no evidence that Mortgage Group was prejudiced in any way by the transaction that Rush attempted. Therefore, no paramount equities in favor of Mortgage Group would defeat, as a matter of law, Rush's equitable subrogation claim for reinstatement. Mortgage Group's summary judgment cannot be sustained on a paramount equities theory.

### B. *Necessary Parties for Equitable Subrogation*

Mortgage Group asserts that, should we reverse the grant of summary judgment, Rush has not joined parties needed for just adjudication, making Rush's proposed remedy of subrogation impossible. Mortgage Group claims that since the obligors on the Norris Note are not parties to this case, the court is unable to reinstate Rush's original priority.

Rush counters that since Mortgage Group has foreclosed on the property and sold it to the DePriests, Mortgage Group and the DePriests are able to give Rush complete relief. She argues that reinstating the priority of her security interest would give Mortgage Group and the DePriests the option of paying off Rush or losing the property to Rush. Norris, as the maker of the Norris Note, and others who assumed the note are not needed to give relief to Rush.

■ We agree with Rush's arguments that Mortgage Group and the DePriests can afford complete relief to Rush under equitable subrogation. The superior court dismissed Norris because Rush's main theory of equitable subrogation would lead to a disgorgement of unjust enrichment, which only Mortgage Group and the DePriests arguably received. The individuals liable on the Norris Note have received no benefit as a result of Rush's transaction with Clingman, unlike Mortgage Group and the DePriests. Because they were not unjustly enriched, Shaw's estate, Clingman, and other individuals liable on the Norris Note are not necessary parties to the equitable subrogation claim.[3]

Additionally, Mortgage Group is confused about the remedy equitable subrogation will provide. The intervening deed of trust (in this case, the 1988 Deed of Trust) will be subrogated to the original deed of trust (the 1976 Deed of Trust). Because the original deed of trust had first priority, equitable subrogation will place the 1988 Deed of Trust in first priority. *See Smith v. State Sav. & Loan Ass'n,* 175 Cal.App.3d 1092, 223 Cal. Rptr. 298, 301 (1985) ("The whole theory of equitable subrogation in such situations is that the junior encumbrancer ... is left in exactly the same junior position he had before."). The remedy does not revive the original note.

Mortgage Group assumes that the Norris Note with all of its obligors and the 1976 Deed of Trust must be revived in order to place the parties in the positions they occupied before the Clingman–Rush transaction occurred. However, equitable subrogation will not revive the Norris Note or the 1976 Deed of Trust. Because Norris is no longer personally liable to Rush and is not in possession of the land, Norris is not an indispensable party. The parties will be placed in the positions they would have occupied if the Clingman–Rush transaction had not affected Rush's first priority position.

---

**3.** Mortgage Group argues that attorney Shaw committed malpractice and that his estate is consequently a necessary party. This argument is irrelevant to Rush's equitable subrogation claim. Even assuming Shaw acted negligently, he was not unjustly enriched.

Therefore, under the equitable subrogation doctrine, Rush needed to join only the parties who were unjustly enriched by her mistaken transaction.

## V.   CONCLUSION

We REVERSE the superior court's grant of summary judgment for Mortgage Group and REMAND for further proceedings consistent with this opinion.[4]

MATTHEWS and FABE, JJ., not participating.

4.  Given our holding, it is unnecessary to consider Rush's alternative theories of quasi-contract/unjust enrichment or mistake.